## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ANTHONY RENTIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-0302-CVE-PJC |
| | ) | |
| ENTERPRISE MANUFACTURING LLC, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Now before the Court is Defendant's Motion for Partial Summary Judgment (Dkt. # 21).

Plaintiff Anthony Rentie filed a complaint (Dkt. # 2) stating claims against defendant Enterprise

Manufacturing LLC (Enterprise) for discrimination on the basis of race, retaliatory termination, and

hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000

et seq. (Title VII), and 42 U.S.C. § 1981, and intentional infliction of emotional distress.  Enterprise

seeks summary judgment on Rentie's Title VII, hostile work environment, and intentional infliction

of emotional distress claims.[1]

### I.

The following facts are undisputed.  Rentie is an African-American male and a resident of

Oklahoma.  Dkt. # 2, at 1.  Enterprise is an Oklahoma limited liability company, and a metal

fabrication shop.  Dkt. # 22-2, at 1.  Rentie began his employment with Enterprise in or around May

---

[1]     Enterprise filed Defendant's Application to Supplement Motion for Summary Judgment
(Dkt. # 27), in which it added a request for summary judgment on Rentie's hostile work
environment claims under Title VII and § 1981.  Dkt. # 27, at 1.

2006.  Dkt. # 22-3, at 2.  Throughout his employment, Rentie was Enterprise's sole African-American employee.  Dkt. ## 33-9, at 14; 30-2, at 3.

1.      Structure of Enterprise and Elliot Precision Products, Inc.

In June 2006, Mark Mitchell, Bryan Collins, and Steve Elliot purchased Enterprise.  Dkt. # 22-2, at 1.  At that time, Enterprise had five permanent employees, including Rentie.  Id.[2]  From June 2006 to the present, Enterprise has never had more than five permanent employees.  Id.; see also Dkt. # 30-4, at 1.  From time to time, Enterprise contracts with temporary employees.  Mitchell states that, from June 2006 to the present, Enterprise has not contracted for the services of more than two to three temporary employees at any time.  Dkt. # 22-2, at 1.  However, Gerry Thompson, an Enterprise employee, testified that Enterprise contracts with between four and ten temporary employees from time to time.  Dkt. # 32-8, at 4.

Mitchell, Collins, and Elliot do not report to one another; they exchange information and reach consensus on business decisions.  Id. at 2.  None receives a paycheck from Enterprise; each receives income from Enterprise's profits.  Id.  Profits and losses are shared according to each's ownership share.  Id.

Enterprise designates certain shop employees as "lead men," who take charge of assigning individual tasks within a fabrication job.  Dkt. ## 30-4, at 1; 32-7, at 7.  Although an employee might ask his lead man about getting time off work, the employee would also ask one of the owners.

---

[2]      Rentie argues that the Court should not rely on Mitchell's affidavit because it is not supported by employment records.  However, Rentie would have the Court rely on his unsupported statement that he "received pay stubs with Elliot Precision on them at the beginning of [his] employment."  Dkt. # 32-2, at 3.  Neither party has produced documentary evidence to substantiate its affidavits.  At this time, the Court takes the uncontradicted assertions in each party's affidavits as true.  Further, it is ultimately Rentie's burden to prove that Enterprise has the requisite number of employees.  See Part III.1, infra.

Dkt. # 32-8, at 5.  Lead men do not have the authority to hire, fire, or discipline employees.  Id. at 5, 7; Dkt. # 30-4, at 2.  Gerry Thompson, Regan Hilmer, and Larry Neely were lead men at Enterprise during Rentie's employment.  In May 2007, Rentie switched from working with Thompson to working with Hilmer.  Dkt. # 32-6, at 3.

Mitchell, Collins, and Elliot also own Elliot Precision Products, Inc. (EPP).  Id.  EPP is a precision manufacturing facility that has been in business for over thirty years.  Id.  Rentie estimates that EPP had between forty and forty-five employees at any given time.  Dkt. # 33-2, at 1-2. Mitchell states that  Enterprise and EPP have separate locations, separate employees, keep separate employment, payroll, and bookkeeping records, keep separate bank accounts, file separate taxes, have separate tax identification numbers, carry separate workers compensation and other insurance policies, and have separate health insurance plans.  Dkt. # 22-2, at 3.  Each company pays its own employees.  Id.  However, Rentie states that he received pay stubs with EPP on them "at the beginning of [his] employment."  Dkt. # 33-2, at 3.  Mitchell states that Rentie was always paid by Enterprise.  Dkt. # 22-2, at 2.  Rentie's compensation detail shows that he was paid by Enterprise. Dkt. # 44-3, at 9-11.  Collins testified that Rentie was never employed by EPP.  Dkt. # 32-7, at 5.

Mitchell states that EPP does not control decisions regarding employment matters at Enterprise.  Dkt. # 22-2, at 3.  At his deposition, Collins testified that he does the hiring for both Elliot and EPP.  Dkt. # 32-7, at 4.  Mitchell states that he has the power to hire and fire on Enterprise's behalf, but that Collins often handles the interviewing of new hires.  Dkt. # 2-2, at 3. Rentie states that employees of the two companies "commonly went back and forth between the two buildings to work on the machines."   Dkt. # 33-2, at 1.  It is undisputed that Rentie worked at EPP for one week in June 2007.  Id.  He states that "we commonly had training meetings at [EPP] and

3

employees from both Enterprise and [EPP] participated in the training." Id. at 2.  He also states that "on one occasion, I was in a company truck [ ] that was used by [EPP] and I saw the insurance card and the insurance was maintained by Enterprise."  Id. at 3.

2.      Rentie's Allegations

Rentie alleges that he was not given a raise, while other Caucasian employees were given raises.  He alleges that, when he was hired, Enterprise's former owner promised him a raise after ninety days.  After the business was purchased by Mitchell, Collins, and Elliot, Rentie was told to wait another ninety days.  In December 2006, Collins[3] informed Rentie that his starting pay had been too high and that he would not receive a raise.  Dkt. # 32-6, at 2-3.  Rentie asked for a raise again in May 2007.  Id. at 3.  At some point, Mitchell was considering giving Rentie a raise and asked Gerry Thompson whether he thought Rentie deserved one.  Gerry Thompson did not believe that Rentie was entitled to a raise, and Mitchell decided not to give him one.  Dkt. ## 32-9, at 7; 33-8, at 6.  In January 2008 Rentie received a $1.30 an hour raise. Dkt. # 32-6, at 4.

Rentie alleges that in December 2006, he was working with Gerry Thompson and Neely. Gerry Thompson told Rentie "to tell Larry you're not his n***er."  Dkt. # 33-3, at 4.  On the same day,  a temporary employee named Mike used the word "n***er" to describe the type of work he was doing.  Id.  Rentie testified that he reported both incidents to Mitchell. Dkt. # 32-3, at 17. Mitchell denies that Rentie reported the Gerry Thompson incident to him.  Dkt. # 30-4, at 2.  Mike admitted to Mitchell that he used the word, and Mitchell fired him immediately.  Dkt. # 30-2, at 2. Rentie alleges that Gerry Thompson received no discipline.  After Mike was terminated, Mitchell

---

[3]      Plaintiff's response to defendant's first set of interrogatories (Dkt. # 22-3) states that Rentie discussed the possibility of a raise with Brian Cullison.  Dkt. # 22-3, at 3.  The Court assumes this is a typographical error, and that the raise was discussed with Collins.

and Collins called a staff meeting at which they stated that they would not tolerate the use of racial slurs in the workplace.  Dkt. ## 30-5, at 4; 30-6, at 2.

In June 2007, Rentie was sent to work at EPP for a week.  Dkt. # 22-3, at 3; 33-7, at 5. Rentie saw the word "n***er" written twice in pencil on the wall of a bathroom stall.  Id.; Dkt. # 30-5, at 2.  Rentie alleges that he told Mitchell about it the same day, and then cleaned it up because no one else would.  Dkt. # 22-3, at 3.  However, he also admitted that it was possible he did not report this to Mitchell until some time later, and that he erased the words before he reported the incident to Mitchell. Dkt. # 30-5, at 2.  Mitchell testified that Rentie did not tell him about the word in the bathroom stall until six months after Rentie saw it and erased it.  Dkt. # 30-2, at 2.  Rentie testified that Mitchell's response was "I should have came and told him, that they could have done something about it."  Dkt. # 33-3, at 20.  Mitchell testified that he asked all the employees if they had seen it, and no one other than Rentie had.  Dkt. # 30-2, at 2.

Rentie alleges that, in January 2008, Gerry Thompson asked Rentie to come by his house after work.  Dkt. # 22-3.  Gerry Thompson told Rentie that the reason Rentie had not received a raise is that Mitchell is "racially profiling."  Dkt. # 22-3, at 3.  Gerry Thompson told Rentie that Mitchell said "those people are all the same, nothing but trouble."  Id.  Rentie alleges that he asked Mitchell about the statement the next day, and Mitchell responded by yelling "I am not like that." Dkt. # 22-3, at 3.  Rentie alleges that, later that day, he "caught Gerry and [Mitchell] sending signals. [Mitchell] hand signaled to Gerry telling him to call him.  Gerry gestured back with a head nod of understanding."  Dkt. # 22-3, at 4.  Approximately one week later, Rentie filed an Equal Employment Opportunity Commission complaint and informed Hilmer about the incident.  Dkt. # 22-3, at 4.  Rentie alleges that Mitchell told him he was "going to get a raise of $1.30 an hour

5

because [Rentie] could have walked out while [Mitchell] was yelling at [Rentie]."  Dkt. # 22-3, at 4.

On November 14 or 17, 2008, Rentie overheard Gerry Thompson speaking to his son Colby Thompson in the bathroom.  Rentie alleges that Gerry said "are you trying to be like that n***er wearing both ear phones?" and "are you trying to be like Anthony?"  Dkt. ## 22-3, at 4; 30-5, at 3.  Rentie wore earphones all day at work.  Dkt. # 30-5, at 3.  Gerry denies using the word "n***er" during this conversation.  Dkt. # 30-6, at 3.  Rentie told Mitchell.  Dkt. # 22-3, at 4.

On November 19, 2008 Mitchell called Gerry Thompson into his office.  Id.; Dkt. # 33-8, at 9.  After about ten minutes, Mitchell told Rentie that Gerry Thompson wanted to apologize.[4]  Id.  Gerry Thompson thought that Rentie was trying to have him fired.  Dkt. # 30-6, at 4.  Rentie said he would not accept the apology because "some action needed to be taken."  Dkt. # 33-3, at 28-29.  Rentie testified that he told Mitchell that he was not comfortable in an environment where these sorts of incidents occurred.  Dkt. # 33-3, at 30.

On November 24, 2008, Enterprise implemented a policy banning the use of earphones and text messaging on cellular telephones during business hours.  Dkt. ## 30-2, at 3; 33-12, at 1.  The policy stated that these items posed safety hazards.  Dkt. # 33-12, at 1.  However, Rentie alleges that the policy was not enforced against other employees, who were all Caucasian.  Dkt. # 22-3, at 4.  Rentie believes that a policy regarding racial slurs should have been implemented, and that the policy against earphones was directed at him in particular.  Dkt. # 32-3, at 45.

---

[4]      Although there is evidence that Gerry Thompson wanted to apologize, there is no evidence that Gerry Thompson admitted to using the word.

On December 1, 2008, Rentie went to Mitchell's office and inquired as to why there was not a memo posted about racial slurs. Mitchell replied that there was no need for such a memo. Dkt. # 22-3, at 5. Rentie feels that Gerry Thompson should have been fired over the bathroom incident. Dkt. # 33-3, at 31. Collins and Mitchell testified that they did not take any disciplinary action against Gerry Thompson because they thought that Rentie was either incorrect about what he had heard or had made it up. Dkt. # 33-7, at 8-9. Mitchell had investigated the incident by speaking to Rentie, Gerry Thompson, Colby Thompson, Hilmer, and Neely. Dkt. # 30-2, at 2. Mitchell testified that no one but Rentie had seen or heard anything about the incident.[5] Id.

Mitchell testified that Rentie stated he felt like he was being retaliated against for his complaint about racial discrimination. Dkt. # 32-9, at 13. Rentie mentioned an incident where a Caucasian employee was using his cellular telephone in front of Mitchell. Mitchell allegedly became upset. Dkt. # 22-3, at 5. During this December 1 meeting, Mitchell decided to terminate Rentie's employment. Rentie alleges that Mitchell told Rentie he was terminated "because you are always in my office complaining about something." Dkt. # 22-3, at 5.

In addition to these allegations, Rentie alleges that the following specific instances of racial discrimination occurred:

- Gerry Thompson and Rentie were standing by the brake press, and Gerry Thompson was describing an African-American friend who was trying to bully him. Gerry Thompson stated "he didn't have a problem with busting a n***er in the head." Dkt. # 33-3, at 5.

---

[5] On or about November 14, 2008, Hilmer and Rentie got into an argument. Later, Rentie apologized to Hilmer and explained that he was upset because a few days before [November 14] he overheard Thompson using the word "n***er" to his son. Dkt. # 33-7, at 9-10. Hilmer did not report this to Collins prior to Collins's investigation of Rentie's complaint on November 19. Id. Collins thought something was suspicious because Rentie mentioned the incident to Hilmer on November 14, days before the date he claimed it happened when he reported it to Mitchell and Collins. Id.

- Thompson, Rentie, and Hilmer were driving in a car.  Gery Thompson described another vehicle as a "n***er car."  <u>Id.</u>

- A former Enterprise employee, Russell Biaselli, told Rentie that Gerry Thompson called him a "n***er."  <u>Id.</u> at 6-7.

- A temporary employee, "Shawn," told Rentie that Gerry Thompson called him a "n***er." <u>Id.</u> at 7.

- Regan Hilmer told Rentie that Gerry Thompson stated he did not like Rentie because he was African-American.  <u>Id.</u> at 8.

- Colby Thompson told Rentie that Gerry Thompson referred to him as a "n***er" once before the bathroom incident.  <u>Id.</u> at 7-8.

Rentie testified that he heard the word "n***er" on a daily basis at Enterprise.  <u>Id.</u> at 13.  He testified that he reported the use of the word "n***er" in the workplace to Mitchell and Collins a total of three times.  <u>Id.</u> at 14, 37.  He testified that he did not report the Biaselli incident because he was "trying to humble [him]self because [he] needed the job at the time."  <u>Id.</u> at 12.  Mitchell testified that he never personally heard the word used in the shop.  Dkt. # 33-9, at 15.

Rentie testified that he will not fill out employment applications with companies that do not have African American employees because "I don't want to go through this anymore" and that his experience at Enterprise "got me sceptical [sic] about what jobs I go fill out for and who I work for. It's got me more sensitive to the word [n***er]."  Dkt. # 22-4, at 2.  He also states that he lost many nights of sleep worrying about his work environment, and that he experienced stomach problems and lost weight after being terminated.  Dkt. # 33-2, at 3.

On May 20, 2009, Rentie filed a complaint (Dkt. # 2) alleging racial discrimination and retaliatory discharge in violation of Title VII, violation of 42 U.S.C. § 1981, and intentional infliction of emotional distress.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court draws "all justifiable inferences," id. at 254, and construes the record in the light most

favorable, <u>Garratt v. Walker</u>, 164 F.3d 1249, 1251 (10th Cir. 1998), to the party opposing summary judgment.

## III.

Enterprise seeks summary judgment on Rentie's Title VII, hostile work environment (under Title VII and § 1981),  and intentional infliction of emotional distress claims.  The Court will consider each separately.

1.    <u>Title VII Claims</u>

Rentie alleges that Enterprise discriminated against him, subjected him to a hostile work environment, and terminated him in retaliation for complaining about discrimination, all in violation of Title VII.  Enterprise argues it is entitled to summary judgment because it does not have fifteen or more employees.

Title VII prohibits "employers" from engaging in certain discriminatory and retaliatory employment practices.  <u>See</u> 42 U.S.C. §§ 2000e-2, 2000e-3.  "Employer" is defined in relevant part as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . ."  42 U.S.C. § 2000e(b).  The "current calendar year" is the year in which the alleged discrimination occurred.  <u>Komorowski v. Townline Mini-Mart and Restaurant</u>, 162 F.3d 962, 966 (7th Cir. 1998); <u>Dumas v. Town of Mount Vernon, Ala.</u>, 612 F.2d 974, 979 n.4 (5th Cir. 1980); <u>Vick v. Foote, Inc.</u>, 898 F. Supp. 330, 332 (E.D. Va. 1995), <u>aff'd</u>, 82 F.3d 411 (4th Cir. 1996), <u>cert. denied</u>, 519 U.S. 935 (1996); <u>Jensen v. Johnson County Youth Baseball League</u>, 838 F. Supp. 1437, 1441 (D. Kan. 1993).  An "employee" is "an individual employed by an employer."  42 U.S.C. § 2000e(f).  The requisite number of employees is an element of plaintiff's claim for relief, <u>Arbaugh</u>

v. Y&H Corp., 546 U.S. 500, 516 (2006), and thus, Rentie has the ultimate burden of proof on the

issue.  See Baca v. Total Terrain Inc., No. 07-CV-1335-REB-KMT, 2008 WL 170556, at *1 (D.

Colo. Jan. 15, 2008).

Enterprise argues that Mitchell, Collins, and Elliot are not employees and, thus, do not count

toward the fifteen-employee minimum.  Dkt. # 22, at 8-9.  The Supreme Court has identified six

factors relevant to the inquiry of whether a shareholder-director is an employee under Title VII:

- Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work;

- Whether and, if so, to what extent the organization supervises the individual's work;

- Whether the individual reports to someone higher in the organization;

- Whether and, if so, to what extent the individual is able to influence the organization;

- Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts; and

- Whether the individual shares in the profits, losses, and liabilities of the organization.

Clackamas Gastroenterology Assocs., P.C. v. Wells, 538 U.S. 440, 449-50 (2003).  The Tenth

Circuit looks generally to whether a shareholder performs traditional employee functions or has

more of an employer-employee relationship with the defendant.  See Trainor v. Apollo Metal

Specialties, Inc., 318 F.3d 976, 986-87 (10th Cir. 2002).

Each of Enterprise's owners operates without supervision from the others and does not report

to the others; rather, they all exchange information and reach consensus on business decisions.  Dkt.

# 22-2, at 2.  None of the owners receives a salary from Enterprise, and profits and losses are shared

according to each's proportionate ownership share.  Id.; see Xie v. Univ. of Utah, 243 Fed. App'x

367, 373 (10th Cir. 2007) (unpublished)[6] (concluding that the fact that the university never paid plaintiff a salary was a factor that weighed against a determination that plaintiff was an employee). The record shows that the three owners do not have an employer-employee relationship with Enterprise and, thus, they are not employees of Enterprise for purposes of the fifteen employee minimum.

Enterprise argues that it and EPP are separate employers and that EPP employees should not count towards Enterprise's fifteen-employee minimum.  Dkt. # 22, at 10-12.  Rentie argues that Enterprise and EPP should be treated as a single employer for the purposes of Title VII's fifteen employee requirement.

Although the Tenth Circuit has not spoken directly on the issue,[7] other circuits use the joint or single employer tests to determine whether the employees of two or more entities should be aggregated for the purposes of the fifteen employee minimum.[8]  See Reeves v. DSI Sec. Svcs., 331 Fed. App'x 659 (11th Cir. 2009); Clark v. St. Joseph/Chandler Health Sys., 225 Fed. App'x 799, 800 (11th Cir. 2007) (affirming district court's grant of summary judgment based on numerosity and

---

[6]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.

[7]     In Calvert v. Midwest Restoration Services, Inc., 35 Fed. App'x 798, 801 n.1 (10th Cir. 2002) (unpublished), the Tenth Circuit stated "we have not formally adopted the 'single employer' or 'integrated enterprise' test in this circuit." Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.  The Calvert court applied the integrated enterprise test because it was applied in the district court and both parties argued for its use.  See also Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1184 (10th Cir. 1999) (applying the integrated enterprise test without deciding whether the test was the proper one to apply).

[8]     The single employer or integrated enterprise test is used to determine whether two entities constitute one employer for Title VII purposes.  The joint employer test is used to determine whether a plaintiff was an employee of two or more separate entities.

concluding that under no set of facts could two entities be considered one employer or joint employers for numerosity purposes); Guillory v. Rainbow Chrysler Dodge Jeep, LLC, 158 Fed. App'x 536, 537-38 (5th Cir. 2005) ("[i]n Trevino v. Celanese Corp., 701 F.2d 397 (5th Cir.1983), we held that it is appropriate to treat two seemingly distinct businesses as a single entity where there are '(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.'  The mere existence of common ownership and management does not, without more, however, justify aggregation."); Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 85 (3d Cir. 2003) (using the Seventh  Circuit's single employer test developed in Papa v. Katy Industries, Inc., 166 F.3d 937 (7th Cir. 1999), to determine whether two entities should be aggregated for numerosity purposes); Anderson v. Pacific Maritime Ass'n, 336 F.3d 924, 929 (9th Cir. 2003) ("[a] plaintiff with an otherwise cognizable Title VII claim against an employer with [fewer] than 15 employees may assert that the employer is so interconnected with another employer that the two form an integrated enterprise, and that collectively this enterprise meets the 15-employee minimum standard. We use the integrated enterprise test to judge the magnitude of interconnectivity for determining statutory coverage"); cf. Sanford v. Main Street Baptist Church Manor, Inc., 327 Fed. App'x 587, 594 (6th Cir. 2009) ("aggregation of joint employees for the purposes of establishing the Title VII numerosity requirement is permissible when one joint employer exercises control over the employees of the other joint employer").

The integrated enterprise test is relevant here.  It rests on four factors:

•        interrelation of operations;

•        centralized control over labor relations;

- common management; and

- common ownership or financial control.

Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1184 (10th Cir. 1999); see also Sandoval v. City of Boulder, Colo., 388 F.3d 1312, 1322 (10th Cir. 2004).  The "heart of the inquiry is whether there is an absence of an arm's length relationship [between] the companies."  Knowlton, 189 F.3d at 1184.  The Tenth Circuit generally considers the "centralized control over labor relations" factor to be the most important.  Sandoval, 388 F.3d at 1322.

Mitchell states that Enterprise and EPP have separate locations, keep separate employment records, separate employees, separate payroll records, separate bank accounts, separate bookkeeping records, file separate taxes and have separate tax identification numbers, carry separate workers compensation and other insurance policies, have separate health insurance plans, separate advertising, separate employee manuals and policies, and that each company pays its own employees. Dkt. # 22-2, at 2-3.  Rentie was terminated by Mitchell in his capacity as a manger at Enterprise.  No actions were taken against Rentie on behalf of EPP; nor did Rentie ever complain to Mitchell or Collins in their capacities as owners of EPP.  All of this strongly suggests that Enterprise and EPP are separate employers for Title VII purposes.  Rentie argues that Enterprise and EPP are an integrated enterprise because he worked at EPP for one week, he attended a training

session at EPP,[9] he remembers receiving one paycheck from EPP, he remembers employees often moving between shops, and he remembers parts being worked on in both shops.[10]

The fact that Rentie worked at EPP for one week while employed by Enterprise[11] does not make Enterprise and EPP an integrated enterprise. Collins states that Rentie worked at EPP for one week to receive training on the more complex machines used at EPP. Dkt. # 44-3, at 2. It is common for an employer to "second" an employee to another company; such a practice does not normally suggest the lack of an arm's length relationship between the two. Cf. Sandoval, 388 F.3d at 1322 (finding that a city police department's secondment of its employees to an emergency call center did not render the two entities a single employer). The fact that Enterprise and EPP may have held joint training sessions or that both shops may perform work on a single product[12] does not make them an integrated enterprise. The Tenth Circuit has found two entities to be a joint enterprise where, among other things, they shared a building, phone system, reception area, office equipment, accounting department, personnel manager, personnel handbook, and payroll accounts. See Knowlton, 189 F.3d 1184 n.7. Occasional joint training sessions or sharing of equipment hardly rise

---

[9]     Collins states that Enterprise and EPP each pay for their respective employees' safety training.

[10]    Rentie's assertion that the two companies are "next door" to one another is patently contradicted by all other evidence in the record regarding their relative locations. E.g., Dkt. # 32-9, at 13 (the businesses are "probably a mile [or] less than a mile" away from one another); Dkt. # 44-3, at 1 (providing the two companies' addresses and stating that they are over a mile away from one another). Rentie has failed to raise a genuine issue of material fact regarding the companies' proximity to one another. Further, even if the companies were located next door to one another, this would not be evidence that the two are an integrated enterprise.

[11]    During this week, Rentie continued to be paid by Enterprise. Dkt. # 32, at 7.

[12]    Collins characterizes these arrangements as contractor/subcontractor-type arrangements. Dkt. # 44-3, at 2.

to this level.  Further, performing different tasks in the manufacturing of a metal part does not render two facilities an integrated enterprise; for example, shops that separately formed and painted metal parts would not be integrated enterprises just because a part traveled from one to another.  Finally, the fact that, on one occasion, Rentie (an Enterprise employee) may have used a truck insured by Enterprise and also used by EPP does not demonstrate that the two companies are an integrated enterprise.

Rentie has provided no evidence to substantiate his assertion that he received a paycheck from EPP rather than Enterprise "at the beginning of his employment."  Enterprise has provided payroll records which show that Rentie was always paid by Enterprise.  Dkt. # 44-3, at 9-11.  Rentie has failed to create a genuine issue of material fact regarding the company from which he received payment.  Collins states that EPP never issued a paycheck or other payment to Rentie.  Dkt. # 44-2, at 2.  Given the substantial evidence that Elliot, Mitchell, and Collins operate Enterprise and EPP as distinct entities, Rentie's evidence is not sufficient to support a finding that Enterprise and EPP are an integrated enterprise for the purposes of Title VII's numerosity requirement.

However, there are genuine issues of material fact regarding the number of temporary employees at Enterprise, and the number of employees at Enterprise prior to June 2006.  It is undisputed that Enterprise has not had more than five permanent employees since June 2006.  Dkt. # 22-2, at 1.  However, Gerry Thompson testified that Enterprise may contract with up to ten temporary employees at any given time.  Dkt. # 32-8, at 4.  The duration and nature of any particular temporary employment, which is statutorily relevant, is unknown.  Drawing all reasonable inferences in Rentie's favor, it is possible that Enterprise had fifteen Title VII employees at some time relevant to this matter.  Further, the number of employees at Enterprise prior to June 2006 is

unknown.  Therefore, it is possible that Enterprise had fifteen employees in 2005 or the first twenty weeks of 2006.[13]

Therefore, Enterprise's motion for partial summary judgment based on the number of employees is denied.  Going forward, Rentie has the burden of proof on the number of employees.

2.    Hostile Work Environment

Enterprise argues that Rentie's allegations cannot support a hostile work environment claim under either Title VII or 42 U.S.C. § 1981 because the alleged conduct was not sufficiently severe or pervasive and because the remarks were made by non-management employees.  Dkt. # 30, at 4, 8.

"Although Title VIII does not explicitly mention hostile work environment, a victim of a racially hostile work environment may nevertheless bring a cause of action under Title VII." Ford v. West, 222 F.3d 767, 775 (10th Cir. 2000).  To survive summary judgment on a hostile work environment claim, the plaintiff must "'show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' and that the victim 'was targeted for harassment because of [his] . . . race [ ] or national origin.'"[14] Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007) (quoting Sandoval v. City of Boulder, 388 F.3d 1312, 1326-27 (10th Cir. 2004)).  Pervasiveness and severity

---

[13]    If Enterprise had fifteen employees for twenty weeks in either 2005 or 2006, Rentie's claims for events that occurred in 2006 or 2007 could be viable.

[14]    A race discrimination plaintiff may also bring a claim under § 1981, and the elements of a claim are the same under both laws.  See Tademy v. Union Pac. Corp., 520 F.3d 1149, 1156-57 (10th Cir. 2008).

are independent grounds upon which this element of a hostile work environment claim may be established.  Tademy v. Union Pac. Corp., 520 F.3d 1149, 1161 (10th Cir. 2008).

Rentie identifies numerous specific incidents of the word "n***er" being used in the workplace.  Further, he testified that he heard the word used at Enterprise on a daily basis.  Dkt. # 33-3, at 13.  Drawing all reasonable inferences in Rentie's favor, a jury could find that the use of racially offensive language was sufficiently pervasive to create a hostile working environment at Enterprise.

Next, a court must determine whether an employer may be held liable for the pervasive or severe use of offensive language.  The Tenth Circuit recognizes three bases of employer liability for a hostile work environment created by a supervisor or co-worker's racial harassment: (1) if the conduct occurred within the transgressor's scope of employment; (2) if the employer knew, or should have known about the harassment and failed to respond in a reasonable manner; or (3) if the transgressor acted with apparent authority or was aided by virtue of his or her agency relationship with the employer.  Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1269-70 (10th Cir. 1998).

The first basis for liability does not apply in this case, as there is no evidence that any of the incidents of racial harassment was motivated by an intent to serve Enterprise.  See, e.g., Faragher v. City of Boca Raton, 524 U.S. 775, 794-95 (1998).  The second basis for liability involves two inquiries: the employer's actual or constructive knowledge of harassment, and the "adequacy of the employer's remedial and preventative responses to any actually or constructively known harassment."  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 673 (10th Cir. 1998); see also Tademy, 520 F.3d at 1164.  There are genuine issues of material fact regarding what Rentie reported to

18

Mitchell and Collins, and when he reported it.  For example, Rentie claims that he reported Gerry Thompson's use of the word "n***er" in December 2006, and that Mitchell fired Mike but not Thompson for the same behavior.  Drawing all reasonable inferences in Rentie's favor, it is possible that Mitchell and Collins knew that Gerry Thompson was using inappropriate language and failed to remedy it.  Further, if Mitchell and Collins were aware that Gerry Thompson had used inappropriate language in the past, a jury could reasonably find that Mitchell and Collins's reaction to the bathroom incident was inadequate.

The third basis for employer liability is where the transgressor acted with apparent authority or was aided by his or her agency relationship with the employer.  "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."[15] Faragher, 524 U.S. at 807.  The issue here is whether Gerry Thompson was Rentie's supervisor.[16]  It is undisputed that Gerry Thompson did not have the power to hire, fire, or discipline Rentie.  See Chapman v. Carmike Cinemas, 307 Fed. App'x 164, 169 (10th Cir. 2009) (unpublished)[17] (finding a genuine issue of material fact regarding whether transgressor was plaintiff's supervisor because there was evidence that transgressor had the authority to set schedules, discipline, and recommend termination for employees).  It is also undisputed that Gerry Thompson was not Rentie's "lead man" for the

---

[15]     Enterprise has not raised the so-called Faragher/Ellerth defense.  Cf. McGriff v. Am. Airlines, Inc., 431 F. Supp. 2d 1145, 1155 (N.D. Okla. 2006).

[16]     Only Thompson's comments are at issue here because Hilmer's two comments, only one of which was directed at Rentie, are insufficient to create an actionable hostile working environment.

[17]     Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.

duration of Gerry Thompson's harassment or Rentie's employment.  Further, even while Gerry Thompson was Rentie's lead man, that position gave Gerry Thompson the limited authority to decide how a particular job would be performed.  He did not control all aspects of Rentie's day-to-day work activities.  Cf. Smith v. City of Okla. City, 64 Fed. App'x 122, 127 (2003) (unpublished).[18] The only evidence tending to show that Thompson was Rentie's supervisor is the conversation between Mitchell and Gerry Thompson regarding Rentie's potential raise.  However, this conversation merely shows that Mitchell sought Gerry Thompson's opinion regarding Rentie's work; it is not evidence that Gerry Thompson had supervisory authority over Rentie, nor is it evidence that Gerry Thompson made any decision regarding Rentie's employment. Mitchell testified that he made the decision whether or not to give Rentie a raise.  Dkt. # 32-9, at 8.  Therefore, Enterprise cannot be held liable for Thompson's comments on the basis of vicarious or supervisory liability.

There are genuine issues of material fact that preclude summary judgment in Enterprise's favor on Rentie's hostile work environment claim.  However, some of Rentie's theories of hostile work environment liability fail as a matter of law.  Enterprise cannot be held liable  based on theories that Gerry Thompson was acting within the scope of his employment or that Gerry Thompson was Rentie's supervisor.  However, Enterprise may potentially be held liable for its knowledge of, and failure to remedy, a hostile work environment.

---

[18]    Unpublished decisions are not precedential, but may be cited for their persuasive value.  See Fed. R. App. 32.1: 10th Cir. R. 32.1.

3.      Intentional Infliction of Emotional Distress

To prevail on a claim for intentional infliction of emotional distress, Rentie must show that

Enterprise, "by extreme and outrageous conduct intentionally or recklessly cause[d him] severe

emotional distress . . . ."  Kraszewski v. Baptist Med. Ctr. of Okla, Inc., 916 P.2d 241, 248 (Okla.

1996).  The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond

all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community."  RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965); see also Chandler v. Denton,

741 P.2d 855, 867 n.35 (Okla. 1987) (stating that the tort of intentional infliction of emotional

distress "is governed by the narrow standards of the Restatement (Second) of Torts § 46").

> Liability for the tort of outrage does not extend "to mere insults, indignities, threats,
> annoyances, petty oppressions, or other trivialities. The rough edges of our society
> are still in need of a good deal of filing down, and in the meantime plaintiffs must
> necessarily be expected and required to be hardened to a certain amount of rough
> language, and to occasional acts that are definitely inconsiderate and unkind . . ." Not
> every abusive outburst or offensive verbal encounter may be converted into a tort;
> on the contrary, it would be indeed unfortunate if the law were to close all the safety
> valves through which irascible tempers might legally blow off steam. The outrageous
> and extreme nature of the conduct to be examined should not be considered in a
> sterile setting, detached from the milieu in which it took place.   The salon of
> Madame Pompadour is not to be likened to the rough-and-tumble atmosphere of the
> American oil refinery. "There is a difference between violent and vile profanity
> addressed to a lady, and the same language to a Butte miner and a United States
> marine." Conduct which, though unreasonable, is neither "beyond all possible
> bounds of decency" in the setting in which it occurred, nor is one that can be
> "regarded as utterly intolerable in a civilized community," falls short of having
> actionable quality. Hurt feelings do not make a cause of action under the
> tort-of-outrage rubric.

Eddy v. Brown  715 P.2d 74, 77 (Okla. 1986).  Further, the emotional distress suffered must be "so

severe that no reasonable man could be expected to endure it."  RESTATEMENT (SECOND) OF TORTS

§ 46 cmt. j (1965).

The Court acts as a gatekeeper and must determine, in the first instance whether "the defendant's conduct may reasonably be regarded so extreme and outrageous as to permit recovery" and whether "based on the evidence presented, severe emotional distress can be found." Breeden v. League Svcs. Corp., 575 P.2d 1374, 1377 (Okla. 1978). Only if reasonable minds could differ regarding the nature of the conduct and the distress suffered should the case be submitted to a jury. Id.; see also Daemi v. Church's Fried Chicken, Inc., 931 F.2d 1379, 1388 (10th Cir. 1991) ("[a]s a threshold matter, courts should determine whether the conduct at issue is sufficient under the extreme and outrageous standard as a matter of law") (applying Oklahoma law).

The Tenth Circuit has determined that multiple incidents of racial harassment, including refusing to shake the plaintiff's hand, directing the plaintiff to call on particular customers because the customer was Mexican or liked Mexicans, sending the plaintiff "Mexican peanut brittle," directing plaintiff to not "Mexicanize" his truck, and frequent references to the plaintiff as "the Mexican" or "the f***ing Mexican" were, combined, not sufficiently egregious to support a claim for intentional infliction of emotional distress. Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 687 (10th Cir. 2007) (applying Wyoming Law, which also follows the Restatement (Second) of Torts). While the use of and permitting the use of racial epithets in the workplace is inappropriate and offensive, Enterprise's conduct in this case was not so extreme and outrageous to rise to the level of intentional infliction of emotional distress. This is especially true given that the comments were made in the context of a machine shop where employees "are rough and have rough backgrounds . . . ." Dkt. # 22, at 14.

Further, Rentie has not demonstrated that he suffered extreme emotional distress. He testified that he will not fill out employment applications for positions with employers who do not

22

have African-American employees because his experience "got me [skeptical] about what jobs I go fill out for and who I work for."   Dkt. # 22-4, at 2.   He also testified that "[I]t's got me more sensitive to the word [n***er]."   <u>Id.</u> He cried in Mitchell's or Collins's office, and experienced stomach problems and depression after his employment was terminated. Dkt. # 33-2, at 3.  This does not rise to the level of emotional distress so severe that no reasonable man could be expected to endure it.

Because Rentie has not alleged that Enterprise engaged in conduct that was sufficiently egregious, or that he suffered sufficiently severe emotional distress, his intentional infliction of emotional distress claim fails as a matter of law.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Partial Summary Judgment (Dkt. # 21) is **granted in part** and **denied in part**: it is granted with respect to Rentie's intentional infliction of emotional distress claim; it is denied with respect to Rentie's Title VII claims and his hostile work environment claims (under Title VII and 42 U.S.C. § 1981).

**IT IS FURTHER ORDERED** that Rentie may advance a theory of liability for a hostile work environment based on management's knowledge of and failure to rectify a hostile work environment.  However, Rentie may not advance theories of liability for a hostile work environment based on vicarious liability for any co-employee's alleged comments.

**DATED** this 1st day of June, 2010.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

23